UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-81492-Civ-Brannon

BRILLIANT MINDS STRATEGIES, INC.,
and JAMES JR. ENTERPRISE, INC.,

    Plaintiffs,

vs.

SOUTHERN WASTE SYSTEMS, LLC,
and SOUTHERN WASTE SYSTEMS, LTD.,

    Defendants.

_____/

**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

THIS CAUSE is before the Court upon a pair of Motions for Summary Judgment filed by Defendants Southern Waste Systems, LLC ("SWS") and Southern Waste Systems, Ltd. ("SWS Ltd.") [DE 128, DE 131]. Plaintiffs Brilliant Minds Strategies, Inc. ("Brilliant Minds") and James Jr. Enterprise, Inc. ("Enterprise") filed their respective responses [DE 135, DE 137], and SWS and SWS Ltd. replied [DE 145, DE 146]. For the reasons stated below, the Motions are GRANTED IN PART and DENIED IN PART.

**I.**    **SUMMARY JUDGMENT STANDARD**

Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The parties must support their respective positions by citation to evidence in the record, including documents, affidavits, declarations, and other discovery materials. Fed. R. Civ. P. 56(c); S.D. Fla. L.R. 56.1.

A fact is material if it "would affect the outcome of the suit under the governing law." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011). An issue is genuine if "a reasonable trier of fact could return judgment" for the non-movant. *Miccosukee Tribe of Indians of Fla. v. U.S.*, 516 F.3d 1235, 1243 (11th Cir. 2008). All facts and reasonable inferences are to be construed in the non-movant's favor, but only "to the extent supportable by the record." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If this burden is met, "the nonmoving party must make a sufficient showing on each essential element of the case for which he [or she] has the burden of proof." *Ray v. Equifax Info. Servs.*, LLC, 327 Fed. Appx. 819, 825 (11th Cir. 2009). At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## II.   BACKGROUND[1]

This lawsuit centers on a dispute among entities regarding a contract to provide vegetation removal services in portions of Palm Beach County. The relevant undisputed facts follow. Plaintiff Brilliant Minds, whose president and owner, Tina M. White, is African-American, renders consulting and contract services to companies bidding on public services contracts [DE 41 ¶¶ 1-3]. Plaintiff Enterprise, whose president, James Little, Jr., is African-American, provides vegetation pickup services [*Id.* ¶¶ 4-6]. Defendant SWS provides waste and

---

[1] These background facts are drawn from Defendants' two statements of material facts [DE 129, DE 132] and Enterprise's response to one of Defendants' statement of facts directed solely at Enterprise [DE 139]. Brilliant Minds did not file any responsive statement of facts. Accordingly, by operation of local rule, the facts set forth in Defendants' Statement directed solely at Brilliant Minds [DE 132] are deemed admitted by Brilliant Minds. S.D. Fla. L.R. 56.1(b).

2

recycling services [DE 129 ¶ 2]. Defendant SWS Ltd. is affiliated with SWS via common ownership, but is a legally separate corporate entity [*Id.* ¶ 3].

The Solid Waste Authority of Palm Beach County ("SWA")[2] provides waste and recycling collection services to Palm Beach County through private haulers under exclusive franchise agreements [*Id.* ¶ 4]. In October 2012, SWA voted to approve Public Bid 14-201/SLB ("Bid") to solicit bids for an agreement to provide waste and recycling collection services to four service areas within Palm Beach County for five years, starting on October 1, 2013 [*Id.* ¶ 5]. The Bid terms are detailed in four key documents (collectively, the "SWA Package"):

1. the "SWA Solid Waste and Recycling Collection Services Bid No. 14-201/SLB November 13, 2012" states general terms and conditions for bidding ("Bid Terms") [DE 41-1];

2. the "Solid Waste and Recycling Collection Services Bid No. 14-201/SLB Minimum Bidder Requirements for Pre-Qualification" states bidder requirements ("Bidder Requirements") [DE 41-2];

3. the "Solid Waste and Recycling Collection Franchise Agreement" is the contract between SWA and the bid winner ("Franchise Agreement") [DE 41-3]; and

4. the "Solid Waste and Recycling Collection Franchise Agreement No. 14-205" is the contract between SWA and SWS for Service Area 4 ("14-205 Agreement") [DE 41-4].

The Bid Terms set a goal of 15% participation by local Small Business Enterprises ("SBEs") in each bidder's plan to provide services [DE 129 ¶ 6; DE 41-1 at 11-12]. Bid Applications were required to include at least 15% participation ("SBE Goal") or evidence of "bona fide efforts" to meet the SBE Goal (collectively, the "SBE Requirement") [DE 41 ¶ 39]. To qualify as a SBE, a business must be (1) certified by the Palm Beach County Office of Small Business Assistance or other Florida governmental agency; (2) have a permanent place of

---

[2] SWA was a previously-named defendant in this matter, however the Court dismissed all claims against SWA on December 7, 2016 [DE 94].

business within Palm Beach County, and (3) hold a business tax receipt issued prior to the issuance of the invitation for bids on November 13, 2012 [DE 41-1 at 11-12].

SWS engaged Brilliant Minds to assist SWS in identifying qualified SBEs for inclusion in a compliant Bid Application for Service 4 ("Bid Application") [DE 132 ¶ 11]. SWS requested that Brilliant Minds participate as a SBE in its Bid Application, and Ms. White—acting for Brilliant Minds—developed the SBE plan for SWS that included Brilliant Minds and Enterprise as SBEs who could perform the specified services [*Id.*].

SWS thereafter submitted a Bid Application that included Brilliant Minds and Enterprise as two of the three SBEs listed [DE 41-5 at 4-6]. The Bid Application states that SWS will pay Brilliant Minds $125,500 annually, to provide "contract administration and contract services," and Enterprise $199,600 annually, to provide "vegetation pick-up and towing services" [*Id.* at 4]. The Bid Application reports SWS's "bona fide efforts" to meet the SBE Goal, including by seeking an exception to the tax receipt deadline for Brilliant Minds and Enterprise, whose tax receipts were issued after the invitation for bids [*Id.* at 9-10].

On February 13, 2013, SWA awarded SWS the 14-205 Agreement to provide waste removal for Service Area 4 [DE 41-4]. The only parties to the 14-205 Agreement are SWA and SWS [*Id.*]. The 14-205 Agreement incorporates SWS's "submitted local SBE plan showing how it will assist [SWA] in achieving this goal [of SBE inclusion] through local SBE supplier and subcontractor participation or any other method" [*Id.* at 46-49]. The 14-205 Agreement provides that "[h]iring of minority personnel, although laudable, does not qualify for meeting the goal" [*Id.* at 47]. Under the 14-205 Agreement, "[f]ailure to make a Bona Fide Effort to implement [SWA's] plan . . . shall be considered by the [SWA] as a failure to perform a material provision

4

of the Contract, and further, shall be cause for debarment." [*Id.* at 47]. For purposes of the 14-205 Agreement, "Bona Fide Effort" means:

> the obligation to make every effort a similarly situated, prudent business entity operating under similar circumstances would make when acting in a determined manner to obtain the intended result by action or expenditure, which is not unreasonably disproportionate or burdensome under the circumstances.

[*Id.* at 48]. Among seven specified actions "required to demonstrate a Bona Fide Effort," the 14-205 Agreement required that:

> [SWS] in the absence of due cause, must use all of the certified local SBE suppliers and contractors listed by [SWS] in its response to the Invitation to Bid, unless the local SBE contractor becomes unwilling or unable to perform. [SWS] shall not replace a listed, local SBE until [SWA] has confirmed that the listed, local SBE is unwilling or unable to perform. If [SWA] agrees that the listed, local SBE is unwilling or unable to perform, the local SBE must be replaced with another certified local SBE supplier or contractor unless otherwise authorized by [SWA].

[*Id.*].

Under the 14-205 Agreement, SWS and its SBE contractors were required to start providing services on October 1, 2013 [*Id.* at 6]. Leading up to this start date, SWS was required to prepare for collection services "in a responsible manner" including by meeting fifteen "mobilization and preparation" deadlines, including the provision of truck orders or verification of vehicle source, securing vehicles, paying a disposal bond, hiring drivers/supervisors, and mailing disclosure notices to commercial customers [*Id.* at 51, 70]. SWA had the express right to collect damages of $10,000 for any task deadline missed, and failure to meet the deadline of more than two tasks could lead to the loss of the exclusive franchise agreement [*Id.* at 51].

At the time SWS submitted its Bid Application, Enterprise had never been involved in vegetation removal [DE 129-2 at 3; Little Dep. 9:4-6]. Mr. Little established Enterprise for the sole and specified purpose of getting into the trash hauling business and participating in the Bid

5

Application and, even as of November 17, 2016, Enterprise had never performed vegetation services for any client [DE 129-2 at 5; Little Dep. 15:18-25 – 16:1-10, 24:4-10]. As of October 1, 2013, Enterprise did not own, possess, or have access to a grapple track to perform the vegetation hauling services as promised and as required under the 14-205 Agreement [DE 129-2 at 31, Little Dep. 138:17-25 – 139:1-12]. Enterprise's stated reason for not having the truck by the deadline was because Enterprise was never given a separate five-year fixed term contract to secure the financial loan to acquire the truck, despite numerous requests made to SWS [*Id.*].

On December 29, 2013, Mr. Little sent an email to SWS with an "official notice that [Enterprise] is preparing to be operational February 4, 2014 for one (1) vegetation route in Area 4 . . . [and is] prepared to purchase all necessary equipment and insurance needed to guarantee timely pickup daily in Area 4" [DE 129-6]. Mr. Little's email noted the need "for SWS to execute the contract with us so we can proceed" to which an SWS representative responded, "I will draw up the contract this week" [*Id.*]. On January 6, 2014, SWS requested that Enterprise "start no later th[a]n 2/15" [DE 129-7]. On February 3, 2014, Mr. Little sent an email to SWS noting "discrepancies over the length of the contract" so that "everything on my part is on hold and the startup date has to be postponed" pending review by Enterprise's attorney [DE 129-8]. On February 10, 2014, SWS sent Enterprise a letter advising "of the terms under which [SWS] will use your services on the Zone 4 contract" and included payment terms, billing requirements, and a statement that:

> As long as you continue to provide the services required by the SWA, pay any penalties incurred as a result of noncompliance by you, and maintain all licenses, permits, and insurance as required by the SWA, SWS will continue to use you as a service provider until the expiration of the Agreement between SWA and SWS.

[DE 129-9]. On May 21, 2014, counsel for SWS sent a letter to Enterprise stating that Enterprise was not fulfilling its required obligations under the SWA contract—including by not acquiring

6

trucks to provide the necessary volume of hauling services—despite repeated communications from SWS advising of the requirements [DE 129-10]. Thus, "SWS has no choice but to add an additional SBE to cover the portion of the contractual obligations that you have not been able to cover." [*Id.*].

On July 10, 2014, SWS sent a letter to SWA seeking to add two certified SBEs to the 14-205 Agreement on grounds that both Enterprise and one of the other SBEs listed in the original Bid Application were unable to fulfill the vegetation removal services as required [DE 129-11]. As for Enterprise, SWS stated that Enterprise had "not been able to obtain the trucks necessary to perform vegetation removal" despite repeated communications from SWS and "multiple opportunities to obtain financing to obtain additional trucks." [*Id.*]. However, according to SWS, Enterprise was still able to provide towing services as required and SWS would continue to use Enterprise as a SBE for towing services [*Id.*]. SWS advised that it had identified Jet Hauling as an additional SBE to provide the vegetation pick-up services [*Id.*]. On August 8, 2014, SWA sent an email approving SWS's request to add Jet Hauling and another entity as certified SBEs for participation under Agreement 14-205 [DE 146-1].

On February 11, 2015, Mrs. White appeared on behalf of Brilliant Minds at a public meeting and claimed that SWS failed to achieve the SBE Requirement and also failed to pay Brilliant Minds [DE 132 ¶ 24]. On July 17, 2015, Mrs. White sent an email to SWA on behalf of Brilliant Minds claiming that "SWS fraudulently represented" that Brilliant Minds would provide contract services as represented in SWS's Bid Application [DE 132-6 at 2]. SWA has never made any determination validating these claims by Mrs. White [DE 132 ¶ 25]. SWA also never disallowed SWS from bidding on or providing services to SWA [*Id.*].

7

Plaintiffs Enterprise and White thereafter sued Defendants SWS and SWS Ltd. for (1) breach of contract, (2) breach of contract to third party beneficiaries, (3) fraud in the inducement, and (4) unjust enrichment, and (5) impairment of contract rights based upon race under 42 U.S.C. § 1981 [DE 41].  Plaintiffs' claims stem from SWS's actions in selecting and later replacing Plaintiffs as SBEs in connection with Agreement 14-205.  Defendants answered with a general denial of all claims and affirmative defenses [DE 50].

### III.     ANALYSIS

Both Defendants move for final summary judgment, arguing (1) there is no evidence to show that SWS Ltd. is connected in any way to the claims in this case, and (2) the undisputed evidence conclusively shows that SWS is entitled to summary judgment on all remaining counts. The Court will address these arguments in turn.

#### A.     *SWS Ltd. is Entitled to Summary Judgment on all Counts*

It is undisputed that SWS Ltd. is a legally separate and distinct corporate affiliate of SWS [DE 129 ¶ 3; DE 139 at 1; DE 132 ¶ 4].  The two SWS entities are affiliated via common ownership, however the record is clear that SWS Ltd. was not a party or signatory to any of the contracts at issue, did not engage either Plaintiff to participate in the Bid Application or the resulting 14-205 Agreement, and was in no way involved with any of the events leading to Plaintiffs' claims in this case [DE 129 ¶ 20; DE 139 at 1; DE 132 ¶ 17].  Plaintiffs concede as much by offering no argument to the contrary.  Thus, the Court grants final summary judgment for SWS Ltd. on all counts.

#### B.     *Count  I – Breach of Contract Against SWS*

Florida law draws a distinction between parties to contracts and third-party beneficiaries; the two are mutually exclusive.  That is, a plaintiff who is not a party to a contract is not entitled

8

to raise a direct breach of contract claim. *Metropolitan Life Ins. Co. v. McCarson*, 467 So. 2d 277 (Fla. 1985); *see also Blu-J, Inc. v. Kemper C.P.A. Grp.*, 916 F.2d 637, 640 (11th Cir. 1990) ("[w]here the contract is designed solely for the benefit of the formal parties thereto, a third person cannot maintain an action thereon."). Such a nonparty may only raise a breach of contract claim if they qualify as an "intended third party beneficiary" of the contract at issue. *Jacobson v. Heritage Quality Constr. Co.*, 604 So.2d 17 (Fla. 4th DCA 1992).

It is undisputed that the only parties and signatories to the 14-205 Agreement are SWS and SWA [DE 41-4; DE 129 ¶ 20; DE 139 at 1]. As non-parties to the contract, Plaintiffs may not raise a direct breach of contract claim. They are limited to raising claims only as alleged intended third-party beneficiaries. This has been done in Count III. Thus, the Court grants summary judgment for SWS on Count I.

### C. *Count III – Breach of Contract, Third Party Beneficiary Against SWS*

"Under Florida law, a third party is an intended beneficiary of a contract between two other parties only if a direct and primary object of the contracting parties was to confer a benefit on the third party." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 982 (11th Cir. 2005). A nonparty is an "intended beneficiary" if "the parties to the contract clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party or a class of persons to which that party claims to belong." *Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd.*, 647 So. 2d 1028, 1031 (Fla. 4th DCA 1994).

There is sufficient evidence to show that Plaintiffs were intended third-party beneficiaries of the 14-205 Agreement. The Bid Terms set a goal of 15% participation by local SBEs in each bidder's plan to provide services [DE 41-1 at 11-12]. Consistent with this requirement, in its Bid Application, SWS included Brilliant Minds and Enterprise as two of three listed SBEs [DE 41-5

9

at 4-6]. Once SWS was awarded the exclusive contract, the resulting 14-205 Agreement between SWS and SWA clearly expresses the intent of both contracting parties to primarily and directly benefit SBEs like Plaintiffs. Indeed, an entire section of the 14-205 Agreement is devoted to SBE participation and requires SWS to make "bona fide efforts" to award 15% of its total contract work to SBEs [DE 41-4 at 46-48]. The 14-205 Agreement also incorporates SWS's "local SBE plan showing how it will assist the [SWA] in achieving this goal through local SBE supplier and subcontractor participation or any other method." [*Id.* at 47]. The 14-205 Agreement thus expresses a clear intent to benefit SBEs overall and the subcontractors SBEs listed on SWS's Bid Application specifically, as demonstrated by the incorporation of SWS's SBE plan listing both Plaintiffs into the 14-205 Agreement as a material provision. Accordingly, indisputable evidence supports Plaintiffs' status as third-party beneficiaries under the 14-205 Agreement.

However, this is not the end of the inquiry. To proceed on their third-party beneficiary claims, Plaintiffs must also show that SWS breached the 14-205 Agreement and that Plaintiffs sustained damages as a result of the breach. *See Caretta Trucking, Inc.*, 647 So. 2d at 1031. A review of the record reveals genuine issues of material fact on these necessary elements. Plaintiffs assert that SWS breached the terms of the 14-205 Agreement by (1) frustrating their ability to perform, (2) acting contrary to the "bona fide efforts" requirement, and (3) terminating them without the requisite SWA Board approval. Plaintiffs seek damages in the form of the income they would have received under the 14-205 Agreement had they been kept on as participating SBEs.

The 14-205 Agreement's section governing SBE participation provided that "[f]ailure to make a Bona Fide Effort to implement [SWA's] plan . . . shall be considered by the [SWA] as a

10

failure to perform a material provision of the Contract, and further, shall be cause for debarment." [DE 41-4 at 47]. "Bona Fide Effort" is defined as:

> the obligation to make every effort a similarly situated, prudent business entity operating under similar circumstances would make when acting in a determined manner to obtain the intended result by action or expenditure, which is not unreasonably disproportionate or burdensome under the circumstances.

[*Id.* at 48]. Among seven specified actions "required to demonstrate a Bona Fide Effort," the 14-205 Agreement required that:

> [SWS] in the absence of due cause, must use all of the certified local SBE suppliers and contractors listed by [SWS] in its response to the Invitation to Bid, unless the local SBE contractor becomes unwilling or unable to perform. [SWS] shall not replace a listed, local SBE until [SWA] has confirmed that the listed, local SBE is unwilling or unable to perform. If [SWA] agrees that the listed, local SBE is unwilling or unable to perform, the local SBE must be replaced with another certified local SBE supplier or contractor unless otherwise authorized by [SWA].

[*Id.*].

As for Enterprise, Mr. Little's testimony shows that at the time SWS submitted its Bid Application, Enterprise was not—and had never been—engaged in vegetation pickup services [DE 129 ¶¶ 14-15]. SWS knew this and engaged Enterprise anyways, with the understanding and promise by Mr. Little that Enterprise would acquire a specialized "grapple truck" equipped with a grappling hook to perform the services as required under the 14-205 Agreement prior to the October 1, 2013 deadline to commence such services [*Id.* ¶ 16-17 (citing Mr. Little's deposition testimony)].

After the scheduled commencement deadline, on December 6, 2013, Mr. Little sent an email to SWS claiming that he "secured financing for equipment needed, and simply need the executed agreement for October 2013-September 2018 including rates for short and long term daily routes" [DE 129-5]. On December 29, 2013, Mr. Little sent another email to SWS as

"official notice that [Enterprise] is preparing to be operational February 4, 2014 for one (1) vegetation route in Area 4 . . . [and after] review of the SWS executed contract with SWA, I am prepared to purchase all necessary equipment and insurance needed to guarantee timely pickup daily in Area 4" [DE 129-6]. Mr. Little noted the "only other matter is for SWS to execute the contract with us so we can proceed[,]" to which a SWS representative responded "I will draw up the contract this week [*Id.*].

On February 3, 2014, Mr. Little sent a third email to SWS noting "discrepancies over the length of the contract" and stating that "everything on my part is on hold and the startup date has to be postponed" pending contract review by Enterprise's attorney [DE 129-8]. On February 10, 2014, SWS responded to Enterprise with a letter advising "of the terms under which [SWS] will use your services on the Zone 4 contract" and included payment terms, billing requirements, and a statement that:

> As long as you continue to provide the services required by the SWA, pay any penalties incurred as a result of noncompliance by you, and maintain all licenses, permits, and insurance as required by the SWA, SWS will continue to use you as a service provider until the expiration of the Agreement between SWA and SWS.

[DE 129-9].

The foregoing email chain includes Mr. Little's repeated requests on behalf of Enterprise for a separate contract to obtain necessary financing for the grapple truck. SWS's argument *now* that it had no obligation under any agreement to provide a separate contract runs contrary to SWS's attempts *then* to comply with Mr. Little's requests, including references to drawing up a contract. Likewise, SWS's argument *now* that Mr. Little's testimony demonstrates he never made any efforts to finance, purchase, or acquire the grapple truck runs contrary to what SWS knew to be true *then*—that Mr. Little was brand new to the vegetation hauling business, did not have a grapple truck, and intended to buy one to perform under the 14-205 Agreement but

12

needed a separate contract to finance the purchase. During his deposition, Mr. Little indicated—consistent with his prior emails to SWS—that his inability to secure a loan for the grapple truck was based on SWS's failure to provide Enterprise with a separate, fixed-term independent contractor agreement [DE 129-2 at 31, Little Dep. 138:17-23]. Under these circumstances, a jury could find that SWS breached the "Bona Fide Efforts" requirement in the 14-205 Agreement and that this breach caused Enterprise damages in the form of lost profits.

Moreover, there are genuine issues of fact as to whether SWS properly terminated Plaintiffs in accord with the 14-205 Agreement, which required SWS to secure SWA's agreement that a "listed, local SBE is unwilling or unable to perform" before such SBE could be replaced [DE 41-4 at 48]. SWS points to its letter to SWA dated July 10, 2014, which sought to add two certified SBEs to the 14-205 Agreement on the basis that both Enterprise and one of the other SBEs (not Brilliant Minds) listed in the original Bid Application were unable to fulfill the vegetation removal services as required [DE 129-11]. SWS explained that Enterprise had "not been able to obtain the trucks necessary to perform vegetation removal" despite repeated communications from SWS and "multiple opportunities to obtain financing to obtain additional trucks." [*Id.*]. SWS noted that Enterprise was still able to provide towing services as required and SWS would continue to use Enterprise as a SBE for towing services [*Id.*]. SWS advised that it had identified an additional SBE to provide the vegetation pick-up services [*Id.*]. SWS further requested "to add an additional SBE for Human Resources Consulting and Legal Services" relative to the 14-205 Agreement [*Id.*]. On August 8, 2014, a director of purchasing services for SWA sent an email to SWS advising that SWA "approves SWS's request to add Jet Hauling and Robyn Hankins, PL" as certified SBEs for participation under the 14-205 Agreement [DE 146-1].

The above evidence creates genuine triable issues of fact regarding Plaintiffs' ability and willingness to perform as SBE contractors under the 14-205 Agreement. SWS claims the evidence shows that SWS gave Enterprise multiple opportunities to participate under the 14-205 Agreement, all to no avail. SWS claims further that Enterprise's failure to secure the grapple truck as required rendered Enterprise "unwilling or unable to perform" thus triggering SWS's right to seek replacement under the 14-205 Agreement. Perhaps. As described above, however, a jury could find otherwise; *i.e.* that Enterprise was willing and able to perform but couldn't as a result of SWS's failure to provide a separate contract in contravention of SWS's required use of "Bona Fide Efforts" to use the SBEs listed in its Bid Application.

As for Brilliant Minds, the undisputed facts are that Ms. White appeared on behalf of Brilliant Minds at a public meeting with SWA on February 11, 2015, and claimed that SWS failed to perform as required under the 14-205 Agreement [DE 132 ¶ 24]. On July 17, 2015, Ms. White—again on behalf of Brilliant Minds—followed up with an email to SWA requesting various documents and claiming that "SWS fraudulently represented" that Brilliant Minds would provide contract services as represented in SWS's Bid Application [DE 132-6 at 2]. SWS summarily argues that this admitted conduct by Ms. White on behalf of Brilliant Minds qualifies as "due cause" for termination under the 14-205 Agreement. However, a jury could find otherwise, especially considering that "due cause" is not a defined term in the 14-205 Agreement and also considering that neither side has come forward with clear evidence regarding the circumstances leading up to Ms. White's actions in 2015.

Unlike the detailed chain of events regarding Enterprise outlined by SWS in its letter to SWA on July 10, 2014, there are no similar statements concerning Brilliant Minds. Moreover, there is no similar evidence showing that SWS formally sought or received SWA approval to

replace Brilliant Minds as required by the 14-205 Agreement. Viewing the overall evidence in the light most favorable to Plaintiffs, as the Court must on summary judgment review, there are genuine issues of material fact for a jury to resolve on Count III. Consequently, the Court denies summary judgment for SWS on this count.

### D.   *Count VI – Fraud in the Inducement*

In Florida, the elements of a fraudulent inducement claim are: "(1) a false statement of material fact; (2) the maker of the false statement knew or should have known of the falsity of the statement; (3) the maker intended that the false statement induce another's reliance; and (4) the other party justifiably relied on the false statement to its detriment." *Sena v. Pereira*, 179 So. 3d 433, 435-36 (Fla. 4th DCA 2015) (quoting *Prieto v. Smook, Inc.*, 97 So. 3d 916, 917 (Fla. 4th DCA 2012)).

Here, there is insufficient evidence on the elements of fraudulent inducement to warrant this case proceeding beyond summary judgment. Plaintiffs contend in the complaint that SWS mislead them "to believe if SWS was a successful bidder, the Plaintiffs would in turn be successful in procuring work pursuant to the Bid" and that by "leading the Plaintiffs to believe they would achieve success in the form of the value of their respective five-year contracts, SWS made a representation of a material fact" [DE 41 ¶¶ 137-140]. Rather than elaborate on, add to, or cite evidence in support of these conclusory, broad allegations in response to Defendants' summary judgment motions, Plaintiffs argue that discovery remains pending and even if "not yet proven, there is an issue of material fact that a specter of fraud exists." [DE 135 at 9, DE 137 at 11]. This is insufficient on summary judgment review.

For starters, Plaintiffs have not met the heightened pleading standard for claims of fraud, which requires a party to set forth: "(1) precisely what statements were made in what documents

15

or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001); Fed. R. Civ. P. 9(b).  Neither Plaintiff points to any facts or evidence offering salient details regarding the content of alleged misrepresentations, when any statement was made, how it was false, whether it furthered any part of the fraudulent scheme, who it was said by, whether that person spoke for SWS, and which of the Plaintiffs received the misinformation and acted upon it.  Rather than be specific, Plaintiffs rely on general, conclusory, and speculative claims unsupported by any evidence regarding the who, what, where, when, and why of the alleged fraudulent behavior.

Alternatively, Plaintiffs' fraudulent inducement claim fails as a matter of law under Florida's independent tort doctrine.  *See Lewis v. Guthartz*, 428 So. 2d 222, 224 (Fla. 1982) (there must be a tort "distinguishable from or independent of [the] breach of contract" for a party to bring a valid claim in tort based on a breach in a contractual relationship).  A fraudulent inducement claim is not "actionable where the alleged fraud contradicts a subsequent written contract."  *Topp, Inc. v. Uniden Am. Corp.*, 513 F. Supp. 2d 1345, 1348 (S.D. Fla. 2007).  "Reliance on fraudulent representations is unreasonable as a matter of law in such situations." *Id.*  "Fraudulent inducement claims will fail even where the subsequent contract 'simply says nothing' about the allegedly false promise." *Id.* (quoting *Eclipse Med., Inc. v. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1342 (S.D. Fla. 1999)).

Here, Plaintiffs' fraudulent inducement claim is not independent of their claims for breach of contract.  That is, Plaintiffs claim that SWS fraudulently induced Plaintiffs to believe

they would "achieve success" in the form of guaranteed payment for five years if SWS was awarded the 14-205 Agreement. This claim is indistinguishable from Plaintiffs' breach-of-contract claims and Count VI is thus barred as a matter of law.

### E. Count VII – Unjust Enrichment

Under Florida law, "[a] claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012).

Plaintiffs claim to have conferred a benefit upon SWS by participating as SBEs in the Bid Application, and that but for this benefit, SWS would not have been awarded the 14-205 Agreement [DE 41¶¶ 157-164]. Notably however, as described above, Plaintiffs have claimed rights as third-party beneficiaries of the 14-205 Agreement. In Florida "the general rule is that if the complaint on its face shows that adequate legal remedies exist, equitable remedies are not available." *Mobil Oil Corp. v. Dade County Esoil Management Co., Inc.*, 982 F. Supp. 873, 880 (S.D. Fla. 1997) (citing *H.L McNorton v. Pan American Bank of Orlando*, 387 So.2d 393, 399 (Fla. 5th DCA 1980)). Upon a showing that an express contract exists, an unjust enrichment count fails. *Id.* Neither Plaintiff disputes this point of Florida law. Nor has either Plaintiff come forward with any evidence or argument in response to Defendants' motions for summary judgment.

In Count VII, Plaintiffs assert an unjust enrichment claim as an alternative to its breach of contract claims. Because Plaintiffs' assertions in this regard are covered by an express

contract—*i.e.* the 14-205 Agreement—Plaintiffs duplicative, interdependent count for unjust enrichment fails as a matter of law.

### F.     Count VIII – Impairment of Contract Rights Based Upon Race under § 1981

"The elements of a cause of action under 42 U.S.C. § 1981 are (1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute."[3]  *Kinnon v. Arcoub, Gopman & Associates, Inc.*, 490 F.3d 886, 891 (11th Cir. 2007). The critical element is the second one, which requires proof of purposeful discrimination. *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 389 (1982); *Rutstein v. Avis Rent–A–Car Sys., Inc.*, 211 F.3d 1228, 1235 (11th Cir. 2000).  "Proof of a prima facie case does not require direct proof of intent to discriminate; evidence of disparate treatment from which the trier of fact may infer discrimination is sufficient."  *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1562 (11th Cir. 1987).

Here, Plaintiffs allege that SWS impaired their contractual right to perform under the 14-205 Agreement by terminating them without cause as African-American-owned SBEs and replacing them with a Caucasian-owned non-SBE company [DE 41 ¶¶ 166-202].  Plaintiffs claim that "[i]n the absence of demonstrating any other non-discriminatory motivating factor, the Plaintiffs' race and sex as African American man and woman were determinative, motivating factors in SWS's decision to terminate its contract with the Plaintiffs." [*Id.* ¶ 201].

Plaintiffs appear to have abandoned this count altogether.  Neither Plaintiff has come forward with any argument or evidence in opposition to Defendant's arguments for summary

---

[3] The enumerated activities include the right to "make and enforce contracts," which is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981.

judgment on this § 1981 claim.[4] The operative complaint's allegations of SWS's alleged discriminatory termination of both Plaintiffs are nothing other than unsupported conclusory allegations. Absent any facts or evidence to show that SWS purposefully discriminated against either Plaintiff on the basis of race or gender, the Court grants summary judgment to SWS on this final count. *See Rutstein*, 211 F.3d at 1235 (showing of intent to discriminate is a "critical element" of a § 1981 claim); *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) (to establish a § 1981 claim, proof of intentional discrimination is essential); *Novelus v. Hebrew Home Sinai, Inc.*, 2012 WL 2675478, at *2 (S.D. Fla. July 6, 2012) (dismissing plaintiff's claim that she was the target of discrimination based on numerous comments regarding her national origin, age, and race after finding that this "allegation, even if true, does not evince Defendant's intent to discriminate against Plaintiff or any causal connection between the circumstances surrounding Plaintiff's termination and Defendant's alleged discrimination").

## IV. **CONCLUSION**

Based on the foregoing, the Court ORDERS that Defendants' Motions for Summary Judgment [DE 128, DE 131] are GRANTED IN PART and DENIED IN PART as follows:

1. The Court GRANTS final summary judgment in favor of SWS Ltd. with respect to all remaining counts. SWS Ltd. shall be terminated as a party to this matter.

2. The Court GRANTS final summary judgment in favor of SWS with respect to Count I (Breach of Contract), Count V (Fraudulent Inducement), Count VII

---

[4] Plaintiffs' depositions do not lend support for their § 1981 claim. In his deposition, Mr. Little acknowledged that nobody at SWS ever made any comments or wrote/said anything to him to indicate that the reason he did not get the five-year contract was because of his race. [DE 129-2 at 29; Little Dep. 111: 1-9]. Mrs. White similarly acknowledged during her deposition that she was not claiming that SWS got the contract because her company Brilliant Minds was a female African-American owned business [DE 132-3 at 10; White Dep. 482:3-13].

(Unjust Enrichment), and Count VIII (Impairment of Contract Rights under 42 U.S.C. § 1981).

3. The Court DENIES summary judgment with respect to Count III (Breach of Contract to Third Party Beneficiaries) as to SWS.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 8th day of February, 2018.

_____
DAVE LEE BRANNON
U.S. MAGISTRATE JUDGE